## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

THIS DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of June 9, 2011, is entered into by and among KT Spears Creek, LLC (the "Borrower"), and JK Air Investment Group, LLC (the "Lender").

## R E C I T A L S

A.    The Borrower previously filed a voluntary petition for relief as a debtor and debtor-in-possession under Title 11 of the United States Bankruptcy Code (as amended from time to time, the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") under Case number 11-33991 (the "Chapter 11 Case").

B.    Borrower is continuing to operate its business and manage its property as a debtor-in-possession under the Bankruptcy Code.

C.    The Borrower has requested that the Lender provide postpetition financing to the Borrower in the form of an unsecured debtor-in-possession loan facility with a maximum aggregate commitment for the Lender of $100,000.00.

D.    The Lender has agreed to make such debtor-in-possession loan and extension of credit subject to the terms and conditions of this Agreement.

E.    In consideration of the mutual covenants and agreements herein contained and of the loans, extensions of credit and commitments hereinafter referred to, the parties hereto agree as follows:

## ARTICLE I
## Definitions and Accounting Matters

Section 1.01    Terms Defined Above.  As used in this Agreement, each term defined above has the meaning indicated above.

Section 1.02    Certain Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" means this Debtor-In-Possession Credit Agreement, as the same may from time to time be amended, modified, supplemented or restated.

"Availability Period" means the period from and including the Effective Date to but excluding the Termination Date.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

"Borrowing" means a borrowing by the Borrower under this Agreement.

"Borrowing Request" means a request by the Borrower for a Borrowing under this Agreement.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in Houston, Texas are authorized or required by law to remain closed.

"Capital Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, recorded as capital leases on the balance sheet of the Person liable (whether contingent or otherwise) for the payment of rent thereunder.

"Carve Out" has the meaning assigned such term in the Interim Order.

"Cash Collateral" has the meaning assigned such term in the Interim Order.

"Casualty Event" means any loss, casualty or other insured damage to any Property of the Borrower in an amount greater than $25,000, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Borrower having a fair market value in excess of $25,000.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute.

"Commitment" means, with respect to the Lender, the commitment of such Lender to make Loans hereunder in an amount up to $100,000.00.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  For the purposes of this definition, and without limiting the generality of the foregoing, any Person that owns directly or indirectly 10% or more of the Equity Interests having ordinary voting power for the election of the directors or other governing body of a Person (other than as a limited partner of such other Person) will be deemed to "control" such other Person.  "Controlling" and "Controlled" have meanings correlative thereto.

"Debt" means, for any Person, without duplication and on a consolidated basis, the sum of the following (without duplication): (a) all obligations of such Person for borrowed money or evidenced by bonds, bankers' acceptances, debentures, notes or other similar instruments; (b) all obligations of such Person (whether contingent or otherwise) in respect of letters of credit, surety or other bonds and similar instruments; (c) all accounts payable and other accrued expenses, liabilities or other obligations of such Person; (d) all obligations of such Person under Capital Leases; (e) all obligations of such Person under Synthetic Leases; (f) all Debt (as defined in the other clauses of this definition) of others secured by a Lien on any property of such Person, whether or not such Debt is assumed by such Person; and (g) all Debt (as defined in the other clauses of this definition) of others guaranteed by such Person or in which such Person otherwise

2

assures a creditor against loss of the Debt (howsoever such assurance shall be made) to the extent of the lesser of the amount of such Debt and the maximum stated amount of such guarantee or assurance against loss.

"DIP Liens" has the meaning assigned such term in Section 2.06.

"Effective Date" means the date on which the conditions specified in Section 5.01 are satisfied (or waived by Lender).

"Environmental Laws" means any and all Governmental Requirements pertaining in any way to public health and safety, the environment, the preservation or reclamation of natural resources, or the management, release or threatened release of any Hazardous Materials, in effect in any and all jurisdictions in which the Borrower is conducting, or at any time has conducted, business, or where any property or assets of the Borrower are located.

"Environmental Permit" means any permit, registration, license, notice, approval, consent, exemption, variance, or other authorization required under or issued pursuant to applicable Environmental Laws.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such Equity Interest.

"Event of Default" has the meaning assigned such term in Section 9.01.

"Excepted Liens" means:  (a) Liens for Taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate action; (b) Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate action; (c) statutory landlord's liens, operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like Liens arising by operation of law in the ordinary course of business; (d) easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations applicable to the Property; and (e) Liens securing Pre-Petition Debt.

"Existing Credit Agreements" means (i) that certain Commercial Promissory Note dated as of May 25, 2006, between Borrower and RBC Centura Bank in the original principal amount of $19,700,000.00, as modified or amended from time to time (the "RBC Bank Note"), and secured by a mortgage on the Excluded Property, (ii) that certain Loan Agreement dated as of December 21, 2007, among the Borrower, First Savers Bank, a division of Plantation Federal Bank, and Kyle D. Tauch in the amount of $6,000,000.00, and secured by a mortgage on all or a portion of the Property; and (iii) that certain loan agreement between the Borrower and First Palmetto Savings Bank entered into in 2006 and by a mortgage on all or a portion of the Property.

"Final Order" means the final order of the Bankruptcy Court that is entered by the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c), which is (i) satisfactory in form and substance to the Borrower and the Lender, adopting and/or leaving undisturbed its finding in the Interim Order, including that credit extended by the Lender under this Agreement and the other Loan Documents will be extended in "good faith" within the meaning of Section 364(e) of the Bankruptcy Code and approving this Agreement and the Transactions (including the granting of the Liens and priority position to be provided in connection therewith), and (ii) not be subject to vacatur, amendment, modification, reversal, or stay.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time subject to the terms and conditions set forth in Section 1.04.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government over the Borrower, any Subsidiary, any of their properties, or the Lender.

"Governmental Requirement" means any law, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, authorization or other directive or requirement (whether or not having the force of law), whether now or hereinafter in effect.

"Hazardous Material" means any substance regulated or as to which liability might arise under any applicable Environmental Law and including without limitation: (a) any chemical, compound, material, product, byproduct, substance or waste defined as or included in the definition or meaning of "hazardous substance," "hazardous material," "hazardous waste," "solid waste," "toxic waste," "extremely hazardous substance," "toxic substance," "contaminant," "pollutant," or words of similar meaning or import found in any applicable Environmental Law; and (b) radioactive materials, explosives, asbestos or asbestos containing materials, polychlorinated biphenyls, radon, infectious or medical wastes.

"Highest Lawful Rate" means the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Note or on other Indebtedness under applicable law.

"Indebtedness" means any and all amounts owing or to be owing by the Borrower, absolute or contingent, due or to become due, now existing or hereafter arising: (a) to the Lender under any Loan Document; and (b) all renewals, extensions and/or rearrangements thereof.

"Interest Rate" means twelve percent (12%) per annum, compounded monthly.

"Interim Order" means the interim order which is entered by the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c), which is in form and substance satisfactory to the Borrower and the Lender in all respects, and which authorizes

4

the incurrence by the Borrower of secured and superpriority indebtedness in accordance with the Loan Documents.

"Investment" means the acquisition (whether for cash, property, services or securities or otherwise) of Equity Interests of any other Person, the contribution of capital to any other Person, or any agreement to make any such acquisition or capital contribution.

"Lien" means any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent.

"Loan Documents" means this Agreement and the Note.

"Loans" has the meaning assigned such term in Section 2.01.

"Material Adverse Effect" means a material adverse change in, or material adverse effect on (a) the business, operations, property or financial condition of the Borrower and its Subsidiaries taken as a whole, (b) the ability of Borrower to perform any of its obligations under any Loan Document, (c) the validity or enforceability of any Loan Document or (d) the rights and remedies of or benefits available to the Lender under any Loan Document.

"Maximum Credit Amount" means, as to the Lender, the amount of $100,000.00, or such higher amount as Lender may agree from time to time.

"Note" means the promissory note of the Borrower described in Section 2.02 and being substantially in the form of Exhibit A, together with all amendments, modifications, replacements, extensions and rearrangements thereof.

"Organizational Documents" means, with respect to any Person, (a) in the case of any corporation, the certificate of incorporation or formation and by-laws (or similar documents) of such Person, (b) in the case of any limited liability company, the certificate of formation and limited liability company agreement (or similar documents) of such Person, (c) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (d) in the case of any general partnership, the partnership agreement (or similar document) of such Person and (e) in any other case, the functional equivalent of the foregoing.

"Permitted Asset Sales" means sales of assets of the Borrower where the consideration received from all of such sales does not exceed $50,000 in the aggregate.

"Permitted Tax Distributions" means tax distributions to the members of the Borrower in an amount equal to (a) the sum of the highest marginal United States federal income tax rate applicable to individuals on ordinary income, multiplied by (b) the Borrower's federal taxable income. Permitted Tax Distributions may be made quarterly, based on the Borrower's estimated taxable income for each applicable quarterly period, and annually, based on the Borrower's annual federal income tax filing.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Pre-Petition Debt" means Debt incurred by the Borrower pursuant to the Existing Credit Agreements.

"Pre-Petition Lenders" means the lenders under the Existing Credit Agreements.

"Property" means all real property owned by the Borrower, wherever located, including, without limitation, the real property described in Exhibit B; but excluding the Excluded Property.

"Redemption" means with respect to any Debt, the repurchase, redemption, prepayment, repayment, defeasance or any other acquisition or retirement for value (or the segregation of funds with respect to any of the foregoing) of such Debt. "Redeem" has the correlative meaning thereto.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors (including attorneys, accountants and experts) of such Person and such Person's Affiliates.

"Reorganization Plan" means a joint plan of reorganization proposed by the Borrower or any other Person in the Chapter 11 Cases.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other Property) with respect to any Equity Interests in the Borrower, or any payment (whether in cash, securities or other Property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in the Borrower, or any option, warrant or other right to acquire any such Equity Interests in the Borrower.

"SEC" means the U.S. Securities and Exchange Commission or any successor Governmental Authority.

"S&P" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., and any successor thereto that is a nationally recognized rating agency.

"Subsidiary" means: (a) any Person of which at least a majority of the outstanding Equity Interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or managers or other governing body of such Person is at the time directly or indirectly owned or controlled by the Borrower, and (b) any partnership of which the Borrower is a general partner.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"Termination Date" means the earlier to occur of (i) June 1, 2012; (ii) the date which is the effective date of any Reorganization Plan; or (iii) the date of the conversion of the Chapter 11

Case to a Chapter 7 Case under the Bankruptcy Code, or (iv) the date of the dismissal of the Chapter 11 Case.

"Transactions" means the execution, delivery and performance by the Borrower of this Agreement and each other Loan Document to which it is a party, the borrowing of the Loans, the use of the proceeds thereof, and the grant of Liens to the Lender by the Borrower on the Collateral.

Section 1.03   Terms Generally; Rules of Construction.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "or" shall mean "and/or".  Unless the context requires otherwise (a) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (b) with respect to the determination of any time period, the word "from" means "from and including" and the word "to" means "to and including" and (c) any reference herein to Articles, Sections, Annexes, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Annexes, Exhibits and Schedules to, this Agreement.

Section 1.04   Accounting Terms and Determinations; GAAP.   Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the Lender hereunder shall be prepared, in accordance with GAAP, applied on a consistent basis.

## ARTICLE II
## The Credits

Section 2.01   Commitment.  Subject to the terms and conditions set forth herein, the Lender agrees to make revolving loans (each a "Loan") to the Borrower during the Availability Period in an aggregate principal amount up to $100,000.00 (the "Commitment").  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, repay and reborrow the Loans.

Section 2.02   Note.  The Loans made by the Lender shall be evidenced by a single Note of the Borrower in substantially the form of Exhibit A, dated as of the date of this Agreement.

Section 2.03   Requests for Borrowings.  To request a Borrowing, the Borrower shall notify the Lender of such request by telephone at least one Business Day before the proposed Borrowing.  Each such telephonic and written Borrowing Request shall specify the following information: (i) the aggregate amount of the requested Borrowing; (ii) the date of such Borrowing, which shall be a Business Day; and (iii) the location and number of the applicable Borrower's account to which funds are to be disbursed.

Section 2.04   Funding of Borrowings. The Lender shall make each Loan to be made by it hereunder on the funding date in the Borrowing Request by wire transfer of immediately available funds to the account of the Borrower specified in the Borrowing Request.

Section 2.05    <u>Termination</u>.    The Commitment of the Lender to make the Loans described herein shall terminate on the Termination Date.

(a)    <u>Grant of Security Interest; Superpriority Administrative Claim</u>.    As security for the prompt payment in full of the Indebtedness, the Borrower hereby pledges and grants to the Lender, a Lien and security interest (subject only to Excepted Liens) in, to and on all of the Collateral (the "<u>DIP Liens</u>").  The Indebtedness shall be a superpriority administrative expense in the Chapter 11 Case as set forth in the Interim Order and Final Order.

# ARTICLE III
## Payments of Principal and Interest; Prepayments; Fees

Section 3.01    <u>Repayment of Loans</u>.  The Borrower hereby unconditionally promises to pay to the Lender the then unpaid interest, fees and principal amount of the Loans in full in cash on the Termination Date.

Section 3.02    <u>Interest</u>.

(a)    <u>Rate</u>.  The Loans shall bear interest at the Interest Rate, but in no event to exceed the Highest Lawful Rate.

(b)    <u>Interest Payment Date</u>.  All accrued and unpaid interest shall be due and payable in full on the Termination Date.

(c)    <u>Interest Rate Computations</u>.  All interest hereunder shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year).

Section 3.03    <u>Prepayments</u>.

(a)    <u>Optional Prepayments</u>.  The Borrower shall have the right at any time and from time to time, to prepay any Borrowing in whole or in part, subject to payment of all accrued and unpaid interest.

(b)    <u>Mandatory Prepayments</u>.  During an Event of Default, the Borrower shall prepay the Borrowings with all net cash proceeds received from sales and other dispositions of any assets of Borrower, subject to payment of all accrued and unpaid interest.

(c)    <u>No Premium or Penalty</u>.  Prepayments permitted or required under this Section 3.03 shall be without premium or penalty.

Section 3.04    <u>Origination Fee</u>.  The Borrower agrees to pay to the Lender an origination fee equal to five percent (5%) of the Commitment, with such fee being accrued to the balance of the Loans as of the Effective Date, and being due and payable in full on the Termination Date.

## ARTICLE IV
## Payments

Section 4.01   <u>Payments Generally</u>.  The Borrower shall make each payment required to be made by them hereunder prior to 5:00 pm, Houston time, on the date when due, in immediately available funds, without defense, deduction, recoupment, set-off or counterclaim.  Fees, once paid, shall be fully earned and shall not be refundable under any circumstances absent manifest error.  All such payments shall be made to the Lender at such place and in such manner as the Lender determines.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.

Section 4.02   <u>Application of Insufficient Payments</u>.  If at any time insufficient funds are received by and available to the Lender to pay fully all amounts of principal, interest and fees then due hereunder and allowable under the Interim Order, the Final Order and/or any other order of the Bankruptcy Court, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, and (ii) second, towards payment of principal then due hereunder.

## ARTICLE V
## Conditions Precedent

Section 5.01   <u>Effective Date</u>.  The obligations of the Lender to make Loans hereunder hall not become effective until the date on which each of the following conditions is satisfied (or waived by Lender):

(a)   After appropriate notice and opportunity for a hearing, entry by the Bankruptcy Court of the Interim Order finding that all credit extended by the Lender under the Loan Documents will be extended in "good faith" within the meaning of Section 364(e) of the Bankruptcy Code, approving this Agreement and the Transactions, and granting the superpriority claim and Priming Liens described herein, and granting the protections to be afforded to the Lender, as described herein, in form and substance reasonably satisfactory to the Lender and the Borrower and approved by the Bankruptcy Court, which shall not have been vacated, modified, amended, reversed or stayed.

(b)   All corporate and judicial proceedings and all instruments and agreements in connection with the Transactions shall be reasonably satisfactory in form and substance to the Lender.

(c)   The Lender and Borrower shall have received from each party hereto counterparts of this Agreement signed on behalf of such party.

(d)   The Lender shall have received a duly executed Note payable to the order of the Lender in a principal amount equal to the Commitment.

(e)   The Lender shall be satisfied that there is no litigation seeking to enjoin or prevent the financing contemplated hereby.

Section 5.02   <u>Each Credit Event</u>.  The obligation of each Lender to make a Loan on the occasion of any Borrowing (including the initial funding), is subject to the satisfaction of the following conditions:

(a)   The Final Order shall be in full force and effect, and shall not have been reversed, modified, amended or stayed, except for such modifications or amendments as may be reasonably acceptable to the Lender.

(b)   At the time of and immediately after giving effect to such Borrowing no Event of Default shall have occurred and be continuing.

(c)   The representations and warranties of the Borrower set forth in this Agreement and in the other Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing except to the extent any such representations and warranties are expressly limited to an earlier date.

(d)   Subject to the terms of the Interim Order, Final Order and/or any other order of the Bankruptcy Court, the Borrower shall have paid the balance of all fees and expenses then payable to the Lender, provided that the Loans shall as necessary be used for this purpose and this condition shall thereupon be satisfied upon the making of such payment from the Loans.

(e)   The receipt by the Lender of a Borrowing Request.

## ARTICLE VI
### Representations and Warranties

The Borrower represents and warrants to the Lender that:

Section 6.01   <u>Organization; Powers</u>.  The Borrower is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted, and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where failure to have such power, authority, licenses, authorizations, consents, approvals and qualifications could not reasonably be expected to have a Material Adverse Effect.

Section 6.02   <u>Authority; Enforceability</u>.  The Transactions have been duly authorized by all necessary limited liability company action of Borrower.  Each Loan Document to which the Borrower is a party has been duly executed and delivered by the Borrower and constitutes a legal, valid and binding obligation of the Borrower enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 6.03   <u>Approvals; No Conflicts</u>.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other third Person, nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Loan Document or the consummation of the

transactions contemplated thereby, except such as have been obtained or made and are in full force and effect other than those third party approvals or consents which, if not made or obtained, could not reasonably be expected to have a Material Adverse Effect or do not have an adverse effect on the enforceability of the Loan Documents, (b) will not violate any applicable law or regulation or any Organizational Document of the Borrower or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower, or give rise to a right thereunder to require any payment to be made by the Borrower, and (d) will not result in the creation or imposition of any Lien on any property of the Borrower (other than the Liens created by the Loan Documents).

Section 6.04    Compliance with the Laws and Agreements; No Defaults.  The Borrower is in compliance with all Governmental Requirements applicable to it or its property and all agreements and other instruments binding upon it or its property, and possesses all licenses, permits, franchises, exemptions, approvals and other authorizations granted by Governmental Authorities necessary for the ownership of its property and the conduct of its business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 6.05    Insurance.  The Borrower has (a) all insurance policies sufficient for compliance with all material Governmental Requirements and all material agreements and (b) insurance coverage in at least amounts and against such risk (including, without limitation, public liability) that are usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Borrower.  The Lender has been named as an additional insured and loss payee in respect of such insurance policies.

Section 6.06    Subsidiaries.  The Borrower has no Subsidiaries.

Section 6.07    Properties; Titles, Etc.

(a)    The Borrower has good and defensible title to the Property and its other assets and properties, in each case, free and clear of all Liens except Liens permitted by Section 8.02.

(b)    The rights and properties presently owned, leased or licensed by the Borrower include all rights necessary to permit the Borrower to conduct its business in all material respects in the same manner as its business has been conducted prior to the date hereof.

Section 6.08    No Brokers.  No Person is entitled to any brokerage fee or finder's fee or similar fee or commission in connection with arranging the Loans contemplated by this Agreement as of the Effective Date.

## ARTICLE VII
## Affirmative Covenants

Until the Commitment has terminated and the principal of and interest on each Loan and all fees payable hereunder and all other amounts payable under the Loan Documents shall have been paid in full, the Borrower covenants and agrees with the Lender that:

Section 7.01    Use of Loan Proceeds.  The Borrower will use the proceeds of the Loans solely to pay for expenses of Borrower during the course of the Chapter 11 Case including, without limitation, for architectural renderings, surveying, appraisals, environmental reports, legal fees, loan origination fees, and other expenses approved by the Lender.

Section 7.02    Requested Information.  Promptly following any request therefore from the Lender, the Borrower will provide to Lender such information regarding the operations, business affairs and financial condition of the Borrower as the Lender may reasonably request.

Section 7.03    Notices of Material Events.  The Borrower will furnish to the Lender prompt written notice of the following:

(a)    the occurrence of any Event of Default;

(b)    the filing or commencement of, or the threat in writing of, any action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority against the Borrower not previously disclosed in writing to the Lender or any material adverse development in any action, suit, proceeding, investigation or arbitration (whether or not previously disclosed to the Lender) that, in either case, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

(c)    the Borrower's receipt of any demand letter.

Section 7.04    Existence; Conduct of Business.  The Borrower will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business and maintain, if necessary, its qualification to do business in each jurisdiction in which its real property assets are located or the ownership of its properties requires such qualification, except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect.

Section 7.05    Operation and Maintenance of Properties.  The Borrower will:

(a)    operate its properties and assets in accordance with the practices of the Borrower's industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, including, without limitation, applicable Environmental Laws, except, in each case, where the failure to comply could not reasonably be expected to have a Material Adverse Effect;

(b)    keep, preserve and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted;

Section 7.06    Insurance.  The Borrower will maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

12

Section 7.07   <u>Books and Records; Inspection Rights</u>.  The Borrower will keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  The Borrower will permit any representatives designated by the Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times during normal business hours and as often as reasonably requested.

Section 7.08   <u>Compliance with Laws</u>.  The Borrower will comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property (including Environmental Laws), except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 7.09   <u>Further Assurances</u>.  The Borrower will promptly execute and deliver to the Lender all such other documents, agreements and instruments reasonably requested by the Lender to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of the Borrower in the Loan Documents, or to correct any defect, error or inaccuracy in this Agreement, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the reasonable discretion of the Lender, in connection therewith.

Section 7.10   <u>Subsidiaries</u>.  In the event that Borrower forms or acquires any Subsidiary, Borrower shall promptly cause such Subsidiary to guarantee the Indebtedness.  In connection with any such guaranty, such Borrower shall, or shall cause such Subsidiary to, (a) execute and deliver a guaranty agreement satisfactory to the Lender, (b) pledge all of the Equity Interests of such new Subsidiary, and (c) execute and deliver such other additional closing documents and certificates as shall reasonably be requested by the Lender.

## ARTICLE VIII
## Negative Covenants

Until the Commitment has terminated and the principal of and interest on each Loan and all fees payable hereunder and all other amounts payable under the Loan Documents have been paid in full, the Borrower covenants and agrees with the Lender that:

Section 8.01   <u>Debt</u>.  The Borrower will not incur, create, assume or suffer to exist any Debt, except:

(a)   the Note or other Indebtedness arising under the Loan Documents;

(b)   endorsements of negotiable instruments for collection in the ordinary course of business;

(c)   Debt under Capital Leases not to exceed $100,000.00 in aggregate principal amount at any time outstanding; and

(d)   Pre-Petition Debt.

13

Section 8.02     Liens.  The Borrower will not create, incur, assume or permit to exist any Lien on any of its properties (now owned or hereafter acquired), except:

        (a)     DIP Liens securing the payment of the Indebtedness;

        (b)     Excepted Liens;

        (c)     Liens securing Capital Leases permitted by Section 8.01(c);

        (d)     Valid, existing Liens of creditors other than the Lender and the Pre-Petition Lenders, but only to the extent determined by the Bankruptcy Court; and

        (e)     Liens securing the Carve Out.

Section 8.03     Dividends, Distributions and Redemptions.  The Borrower will not declare, pay or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or return any capital or make any distribution of its property or assets to its Equity Interest holders, except Borrower may declare and pay Permitted Tax Distributions.

Section 8.04     Investments, Loans and Advances.  The Borrower will not make any Investments in or to any Person.

Section 8.05     Nature of Business.  The Borrower will not allow any material change to be made in the character of its business.

Section 8.06     Mergers, Etc.  Borrower will not merge into or with or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its property to any other Person (whether now owned or hereafter acquired) (any such transaction, a "consolidation"), or liquidate or dissolve.

Section 8.07     Sale of Properties.  Without the prior written consent of the Lender, the Borrower will not sell, assign, convey or otherwise transfer any property or assets except for Permitted Asset Sales.

Section 8.08     Subsidiaries.  The Borrower will not create or acquire any Subsidiary unless the Borrower gives prior written notice to the Lender of such creation or acquisition and complies with the terms of this Agreement regarding Subsidiaries.  The Borrower shall not sell, assign or otherwise dispose of any Equity Interests in any Subsidiary.

Section 8.09     Negative Pledge Agreements; Dividend Restrictions.  Borrower will not create, incur, assume or suffer to exist any contract, agreement or understanding (other than this Agreement, or Capital Leases creating Liens permitted by Section 8.02(c), or the Pre-Petition Credit Agreements) which in any way prohibits or restricts the granting, conveying, creation or imposition of any Lien on any of its property in favor of the Lender, or which requires the consent of or notice to other Persons in connection therewith.

Section 8.10     Plan of Reorganization.  Borrower will not file any Plan of Reorganization that has not been previously approved by the Lender in writing.

## ARTICLE IX
## Events of Default; Remedies

Section 9.01     Events of Default.  One or more of the following events shall constitute an "Event of Default":

(a)     the Borrower shall fail to pay any interest on or principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration or otherwise.

(b)     any representation or warranty made or deemed made by or on behalf of the Borrower in or in connection with any Loan Document shall prove to have been incorrect when made or deemed made.

(c)     the Borrower shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document, and such failure shall continue unremedied for a period of ten (10) days after notice thereof from the Lender to the Borrower.

(d)     (i) the Chapter 11 Case of Borrower shall be dismissed or converted to a Chapter 7 case, (ii) a Chapter 11 Trustee, a responsible officer or an examiner with enlarged powers relating to the operation of the business of Borrower shall be appointed in the Chapter 11 Case and the order appointing such Person shall not be reversed or vacated within five (5) Business Days after the entry thereof, (iii) any other superpriority claim which is *pari passu* with or senior to the claims of the Lender shall be granted; or (iv) the Chapter 11 Case shall be moved from the Southern Division of Texas, Houston Division, to any other bankruptcy court including, without limitation, to the United States Bankruptcy Court for the District of South Carolina.

(e)     the Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any security interest other than the Lender.

(f)     an order shall be entered reversing, amending, supplementing, staying for a period in excess of five (5) Business Days, vacating or otherwise modifying the Interim Order or the Final Order without the consent of the Lender.

(g)     (i) one or more judgments as to any post-petition obligation shall be rendered against either Borrower and the enforcement thereof shall not be stayed (by court ordered stay or by consent of the party litigants) or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, shall be rendered against Borrower.

(h)     the Loan Documents after delivery thereof shall for any reason, except to the extent permitted by the terms thereof, cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against the Borrower.

(i)     Failure of the Borrower to file a Plan of Reorganization acceptable to Lender by September 2, 2011, or to have a Plan of Reorganization acceptable to Lender confirmed by November 30, 2011.

(j)     the filing and/or pursuing confirmation of any Plan of Reorganization that has not been approved by the Lender.

(k)     the filing of any pleading by Borrower, or support of any pleading by Borrower that, unless otherwise waived by the Lender, would deny the Lender the ability to credit bid, as permitted under Bankruptcy Code §363(k).

Section 9.02    <u>Remedies</u>.

(a)     At any time during the continuance of an Event of Default, the Lender may, by notice to the Borrower, take any or all of the following actions, at the same or different times: (i) terminate the Commitment, and thereupon the Commitment shall terminate immediately, or (ii) declare the Note and the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder and under the Note and the other Loan Documents, shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by the Borrower, or (iii) exercise all remedies of a secured party against the property and assets securing the Indebtedness as provided herein, and in the Interim Order, in the Final Order, and under applicable law. In addition to (and not in lieu of) the foregoing remedies, at any time during the continuance of an Event of Default until the Indebtedness has been paid in full, the Lender shall have the right to designate a majority of the managers or directors of the Borrower resulting in the Lender having full and complete control over the Borrower during such period. The holder of the Equity Interest in Borrower agrees to vote all such Equity Interests held by them to appoint the managers or directors so designated by the Lender.

(b)     In the case of the occurrence and continuance of an Event of Default, the Lender will have all other rights and remedies available at law and equity.

(c)     All proceeds realized from the liquidation or other disposition of collateral or otherwise received after maturity of the Note, whether by acceleration or otherwise, shall be applied:

(i)     *first*, to payment or reimbursement of that portion of the Indebtedness constituting fees, expenses and indemnities payable to the Lender;

(ii)     *second,* to payment of accrued interest on the Loans;

(iii)     *third*, payment of principal outstanding on the Loans;

(iv)     *fourth*, to any other Indebtedness; and

(v) *fifth*, any excess, after all of the Indebtedness shall have been indefeasibly paid in full in cash, shall be paid to the Borrower or as otherwise required by any Governmental Requirement.

## ARTICLE X
## Miscellaneous

Section 10.01   Notices.

    (a)   Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to Section 10.01(b)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, or mailed by certified or registered mail, as follows:

    (i)   if to the Borrower, to it at 22 Waugh Rd., Suite 270, Houston, Texas 77007.

    (ii)   if to the Lender, to it at 550 Westcott, Suite 235, Houston, Texas 77007.

    (b)   The Lender or the Borrower may, in their discretion, agree to accept notices and other communications hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

    (c)   Any party hereto may change its address for notices and other communications hereunder by notice to the other party hereto.   All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

Section 10.02   Waivers; Amendments.

    (a)   No failure on the part of the Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege, or any abandonment or discontinuance of steps to enforce such right, power or privilege, under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, power or privilege.   The rights and remedies of the Lender hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.   Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Event of Default, regardless of whether the Lender may have had notice or knowledge of such Event of Default at the time.

    (b)   This Agreement may only be amended by written agreement of the Borrower and the Lender.

Section 10.03   Expenses.   The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Lender in the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all costs, expenses, Taxes, assessments and other charges incurred by the Lender in connection with any filing, registration, recording or perfection of any security interest contemplated by this Agreement, (iii) all out of pocket expenses incurred by the Lender, including the fees, charges and disbursements of any counsel for the Lender, in connection with the enforcement or protection of its rights in connection with this Agreement or any other Loan Document, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans; provided, however, that attorney fees and expenses may only be paid as approved by the Bankruptcy Court or the terms of any order of the Bankruptcy Court.

Section 10.04   Successors and Assigns.

(a)      The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      The Lender may assign to one or more assignees or participants all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of the Borrower, provided that no consent of the Borrower shall be required for an assignment made during the continuation of an Event of Default.

(c)      The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, and this Section 10.04(c) shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release the Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(d)      Notwithstanding any other provisions of this Section 10.04, no transfer or assignment of the interests or obligations of the Lender or any grant of participations therein shall be permitted if such transfer, assignment or grant would require the Borrower to file a registration statement with the SEC or to qualify the Loans under the "Blue Sky" laws of any state.

Section 10.05   Survival; Revival; Reinstatement.

(a)     All covenants, agreements, representations and warranties made by the Borrower herein and in the other Loan Documents shall be considered to have been relied upon by the Lender and shall survive the execution and delivery of this Agreement and the making of any Loans, regardless of any investigation made by the Lender or on its behalf.

(b)     To the extent that any payments on the Indebtedness or proceeds of any collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver or other Person under any bankruptcy law, common law or equitable cause, then to such extent, the Indebtedness so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Lender's Liens, security interests, rights, powers and remedies under this Agreement, the Interim Order, the Final Order, and each Loan Document shall continue in full force and effect. In such event, each Loan Document shall be automatically reinstated and the Borrower shall take such action as may be reasonably requested by the Lender to effect such reinstatement.

Section 10.06   Counterparts; Integration; Effectiveness.

(a)     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

(b)     This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.   **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES HERETO AND THERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

(c)     Delivery of an executed counterpart of a signature page of this Agreement or any other Loan Document by telecopy, pdf or other electronic transmission shall be effective as delivery of a manually executed counterpart thereof.

Section 10.07   Severability.   Any provision of this Agreement or any other Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof or thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 10.08   GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS.

(a)     THIS AGREEMENT AND THE NOTES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS. CHAPTER 346 OF THE TEXAS FINANCE CODE (WHICH REGULATES CERTAIN

REVOLVING CREDIT LOAN ACCOUNTS AND REVOLVING TRI-PARTY ACCOUNTS) SHALL NOT APPLY TO THIS AGREEMENT OR THE NOTES.

(b) ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THE LOAN DOCUMENTS SHALL BE BROUGHT IN THE BANKRUPTCY COURT SO LONG AS THE BANKRUPTCY CASE IS PENDING AND THEREAFTER, IN THE COURTS OF THE STATE OF TEXAS OR OF THE UNITED STATES OF AMERICA LOCATED IN HARRIS COUNTY, TEXAS, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HEREBY ACCEPTS FOR ITSELF AND (TO THE EXTENT PERMITTED BY LAW) IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS. THIS SUBMISSION TO JURISDICTION IS NON-EXCLUSIVE AND DOES NOT PRECLUDE A PARTY FROM OBTAINING JURISDICTION OVER ANOTHER PARTY IN ANY COURT OTHERWISE HAVING JURISDICTION.

(c) EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO IT AT THE ADDRESS SPECIFIED IN SECTION 10.01 OR SUCH OTHER ADDRESS AS IS SPECIFIED PURSUANT TO SECTION 10.01, SUCH SERVICE TO BECOME EFFECTIVE THIRTY (30) DAYS AFTER SUCH MAILING. NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY OR ANY HOLDER OF A NOTE TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANOTHER PARTY IN ANY OTHER JURISDICTION.

(d) EACH PARTY HEREBY (i) IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; (ii) IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES; AND (iii) CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE, AGENT OR COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS.

Section 10.09 <u>Headings</u>. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.10   Interest Rate Limitation.  It is the intention of the parties hereto that the Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby would be usurious as to the Lender under laws applicable to it (including the laws of the United States of America and the State of Texas or any other jurisdiction whose laws may be mandatorily applicable to such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in any of the Loan Documents, it is agreed as follows:  (a) the aggregate of all consideration which constitutes interest under law applicable to the Lender that is contracted for, taken, reserved, charged or received by the Lender under any of the Loan Documents or agreements or otherwise in connection with the Note shall under no circumstances exceed the maximum amount allowed by such applicable law, and any excess shall be canceled automatically and if theretofore paid shall be credited by the Lender on the principal amount of the Indebtedness (or, to the extent that the principal amount of the Indebtedness shall have been or would thereby be paid in full, refunded by the Lender to the Borrower); and (b) in the event that the maturity of the Note is accelerated by reason of an election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to the Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by the Lender as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by the Lender on the principal amount of the Indebtedness (or, to the extent that the principal amount of the Indebtedness shall have been or would thereby be paid in full, refunded by the Lender to the Borrower).  All sums paid or agreed to be paid to the Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to the Lender, be amortized, prorated, allocated and spread throughout the stated term of the Loans evidenced by the Note until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law.  To the extent that Chapter 303 of the Texas Finance Code is relevant for the purpose of determining the Highest Lawful Rate applicable to the Lender, the Lender elects to determine the applicable rate ceiling under such Chapter by the weekly ceiling from time to time in effect.  Chapter 346 of the Texas Finance Code does not apply to the Borrower's obligations hereunder.

[SIGNATURE PAGE FOLLOWS]

    The parties hereto have caused this Agreement to be duly executed as of the day and year first above written.


BORROWER:                    **KT SPEARS CREEK, LLC**

                                    By:_____
                                    Name:_____
                                    Title:_____


LENDER:                      **JK AIR INVESTMENT GROUP, LLC**

                                      By:_____
                                    Name:_____
                                    Title:_____

## EXHIBIT A
## PROMISSORY NOTE

$100,000.00                                                    _____, 2011

FOR VALUE RECEIVED, KT Spears Creek, LLC, a South Carolina limited liability company (the "Borrower") hereby promises to pay to JK Air Investment Group, LLC (the "Lender"), or its registered assigns, at the place and in the manner designated by the Lender, the principal sum of up to One Hundred Thousand Dollars ($100,000.00) or such lesser amount as shall equal the aggregate unpaid principal amount of the Loans made by the Lender to the Borrower under the Credit Agreement, as hereinafter defined), in lawful money of the United States of America and in immediately available funds, on the date provided in the Credit Agreement, and to pay interest on the unpaid principal amount of each such Loan, at such office, in like money and funds, for the period commencing on the date of such Loan until such Loan shall be paid in full, at the rates per annum and on the dates provided in the Credit Agreement.

This Note is the Note referred to in the Debtor-In-Possession Credit Agreement dated as of _____, 2011, between the Borrower and the Lender (as the same may be amended, supplemented or restated from time to time, the "Credit Agreement"), and evidences Loans made by the Lender thereunder.  Capitalized terms used in this Note have the respective meanings assigned to them in the Credit Agreement.

This Note is a registered Note and, as provided in the Credit Agreement, upon surrender of this Note for registration of transfer or exchange (and in the case of a surrender for registration of transfer, duly endorsed or accompanied by a written instrument of transfer duly executed by the registered holder of this Note or such holder's attorney duly authorized in writing), a new Note for a like aggregate principal amount will be issued to, and registered in the name of, the transferee.  Prior to the due presentment for registration and transfer, the Borrower may treat the Person in whose name this Note is registered as the holder and the owner of this Note for the purpose of receiving payment and for all other purposes of this Note and the Credit Agreement. Notwithstanding anything to the contrary herein, the right to receive payments of interest and principal under this Note shall be transferable only upon surrender of this Note for cancellation of this Note, and the issuance of a new Note registered in the name of the transferee.

This Note is issued pursuant to, and is subject to the terms and conditions set forth in, the Credit Agreement and is entitled to the benefits provided for in the Credit Agreement and the other Loan Documents.  The Credit Agreement provides for the acceleration of the maturity of this Note upon the occurrence of certain events, for prepayments of Loans upon the terms and conditions specified therein and other provisions relevant to this Note.  THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS.

**KT SPEARS CREEK, LLC**

By:_____
Name:_____
Title:_____

*Signature Page to Credit Agreement*